# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

GEORGE M. MILLER,

       Plaintiff,

vs.                                CASE NO. 8:02-CV-1080-T-24MSS

EVERETT S. RICE, Sheriff of
Pinellas County, in his official
capacity; and DEPUTY CHARLES
STREET, Individually,

       Defendants.
_____/

## AFFIDAVIT OF DEPUTY CHARLES STREET

**STATE OF FLORIDA**    )
                          ) **s.s.**
**COUNTY OF PINELLAS**  )

       Charles Street, first being duly sworn, states:

       1.      I am Deputy Charles Street in the above captioned matter. I make the following statements based upon my personal knowledge and would testify to these facts if called as a witness.

       2.      On March 28, 2000 while serving as a Deputy Sheriff for the Pinellas County Sheriff's Office, State of Florida, I did wound an individual by means of discharging my service firearm issued to me by the Pinellas County Sheriff's Office. At all times prior to wounding this individual, and after wounding him, I repeatedly issued commands to the individual to surrender as I yelled to him that he was under arrest.

       3.      The individual I wounded had earlier identified himself as Greg James. I

interviewed him as a result of being requested by the driver's license office to investigate an individual suspect of using false documents to obtain Florida identification. Prior to conducting this interview, I informed the individual of his Miranda rights. This individual, later identified as George Miller, made the following admissions to me after I informed him of his "Miranda" rights. He had admitted to using false identification documents in an attempt to obtain a Florida Identification Card. I told him he wasn't free to leave and that I was going to place him the back of a patrol car while we worked this out. At that time I did not know "Mr. James" was actually George Miller and that he was an escaped convict.

4.      After so being instructed to surrender, Mr. Miller immediately fled. I pursued Mr. Miller on foot until he crossed Enterprise Road that is located in Pinellas County. I observed Mr. Miller approach a Mercury Topaz, white in color. He opened the driver's door and began attempting to forcibly remove the driver. In response, the driver entered Enterprise from a shopping center parking lot exit road and turned westbound onto Enterprise. This caused the motor vehicle to head directly in my direction. At that point I was standing in the center of the Enterprise Road.

5.      As the driver of the Topaz approached me Mr. Miller was hanging onto the driver's head trying to forcibly remove the driver from the vehicle. Such conduct, in my opinion, placed the driver's life in jeopardy. I unholstered my firearm as I observed Mr. Miller's physical violence upon the driver. As the Topaz drove past me, and while Mr. Miller was violently assaulting the driver as I have described, I fired three shots directly at Mr. Miller.

6.      The three shots fired at Mr. Miller failed to stop Mr. Miller. He continued to assault the driver as the driver drove westward on Enterprise. When Mr. Miller failed to remove the driver from the Topaz, he abandoned that effort. He then ran around a box truck that impeded the westward movement of the Topaz. While this occurred I renewed my foot pursuit and commands to Mr. Miller.

7.      Mr. Miller did not yield to my commands to surrender. Instead, he made an attempt to access a second motor vehicle. The driver of that vehicle resisted and the attempt to take this vehicle by Mr. Miller failed. Upon failing, Mr. Miller then turned in my direction from that vehicle and made a continuous move towards a third vehicle occupied by a woman. It was my formed belief that Mr. Miller was then and there engaged in an attempt to seize that motor vehicle.

8.      Mr. Miller did not heed any of my commands to surrender. He did not engage in any conduct that suggested he was surrendering or about to surrender. As Mr. Miller was turning away from me and towards the third vehicle and driver, I fired my firearm for the fourth time. Mr. Miller then went down and his arrest was then effected.

9.      I did not conduct any survey of Mr. Miller's wounds at that time. My knowledge of his wounds has been strictly second-hand, or hearsay if you will. I was initially told that the surgical reports had revealed Mr. Miller suffered an entrance wound to the stomach. My recollection of his wounding, however, was different. Nevertheless, as a result of these circumstances, I subsequently relied upon this hearsay representation as being true and testified that my fourth shot must have hit Mr. Miller in the stomach during a discovery deposition in Mr. Miller's criminal case. Even then, I was very clear

on this point and testified as follows:

> "Q      And the second time you strike him, you strike him where?

> "A      In the stomach.

> "Q      So he's still facing you at this point?

> "A      Yes.

> "Q      Even though he's going towards this sport utility vehicle?

> "A      Yes. From what I've read in the reports, the entrance wound is off the belly button. From what I recall in my memory, I recall hitting him in the back. But he did look at me. And, again, I made the determination that he was going from here to here to here. Didn't get this car, didn't get this car, was going for number three.
> (Street Deposition, p. 21 – attached Street Affidavit Exhibit A)

11.      The Court should note that Plaintiff's Counsel's recitations in his motion for summary judgment, presented at page 6, deleted essential aspects of my deposition testimony. My actual testimony addressed the distinctions between my actual memory of the event and reports I later read that are inconsistent with my memory. Thus, my testimony as "reconstructed" by Plaintiff's Counsel conveys a false impression of my actual testimony. In addition, I have now been benefited by a nearly complete report of Dr. Jon Thogmartin, a forensic pathologist, regarding his analysis of the bullet wounds received by Mr. Miller. I now know that my memory was accurate and that the initial reports of an entrance wound at the stomach are inaccurate. I have therefore since confirmed what I first believed, that the bullet fired on this occasion actually struck Mr. Miller in the back at the belt line over the right hip and that a fragment of the bullet exited above his navel and to his right. This account is wholly consistent with my memory as I originally related in my deposition.

12.     At no time did I fire upon Mr. Miller before he engaged in a forcible felony. At no time did I fire upon Mr. Miller during an alleged act of surrender.

13.     I did not fire any "warning" shot(s), nor did I threaten to do so. I can give several reasons warning shots should not be used.

First, warning shots may not be fired as a matter of Pinellas County Sheriff's Policy. I have not been trained at anytime to fire a warning shot, and I am unaware of any law enforcement training how and when warning shots may or should be fired.

Second, no firearm should be discharged with indifference to whether a backstop exists. Warning shots, including errant shots, can injure or kill innocent people, and cause unjustified property damage.

Third, warning shots escalate a confrontation such that a suspect may immediately resort to deadly force or violence upon a law enforcement officer or a citizen.

Fourth, the discharge of a warning shot introduces confusion under dangerous circumstances. Other law enforcement officers may perceive that they, or others, have been fired upon by a suspect. Thus, a warning shot might prematurely precipitate the immediate use of deadly force by a law enforcement officer in error.

Fifth, the discharge of a warning shot provides no reasonable assurance the suspect will perceive the discharge as a warning and then surrender.

Sixth, a warning shot results in the loss of a round of ammunition that may be needed for self-defense or use of deadly force.

Charles Street

Subscribed and sworn to before this 3rd day of September, 2003, by Charles Street,

who is personally known to me.

Notary Public

Phyllis M. Tausend
Commission # CC 912563
Expires Feb. 21, 2004
Bonded Thru
Atlantic Bonding Co., Inc.

1          CHARLES STREET,

2   the deponent herein, being first duly sworn, was examined

3   and testified as follows:

4                    DIRECT EXAMINATION

5   BY MR. ALLDREDGE:

6      Q    Could you state your name and occupation please.

7      A    Charles Robert Street, deputy sheriff with Pinellas

8   County Sheriff's Office.

9      Q    On the 28th day of March of this year, did you have

10  occasion to investigate -- go to the Safety Harbor area to

11  investigate an alleged fraudulent use of identification to

12  obtain a driver's license?

13  (Thereupon, a discussion was held off the record.)

14  BY MR. ALLDREDGE:

15     Q    All right.  I think my question was, on this date

16  you had occasion to go to driver's license office?

17     A    Yes.

18     Q    How did you happen to go there?  Was this a call

19  from the office?

20     A    Yes.

21     Q    What happened when you got there?  What did you

22  find upon arriving there?

23     A    I was instructed to go to the back door, which is

24  their habit.  I was met by a D.H.S.M.V. employee who gave me

25  a Florida I.D. card, a resident alien card, a social

1    security card and a small baptismal certificate from a

2    person by the name of Eric James.

3         Q    They had some suggestion that these may be

4    fraudulent?

5         A    Yes.

6         Q    Did you determine who the person was who gave those

7    items to the clerk?

8         A    The guy who gave his real identity.

9         Q    No.  At that time, at that date --

10        A    He was pointed out to me, yes.

11        Q    Did you talk to him?

12        A    Yes.

13        Q    You talked to him in the office?

14        A    Yes.

15        Q    And what happened when you started talking to him?

16   You're in the office now?

17        A    Yes.  He -- they let me in the back door, the clerk

18   pointed him out to me.  He was taking the test, the driver's

19   test on computer.  I walked up to him, introduced myself,

20   told him I needed to talk to him about some of the documents

21   that he presented that the clerks there didn't think they

22   were quite right.

23        Q    Okay.  Then what happened?

24        A    He seemed surprised by what I had said, pointed

25   over to a friend of his standing across the room several

1  times.  Ask him who I am.  This is who I am.  That's who I

2  am.  I was holding the documents in my hand.  I asked him

3  where he was from.  He told me

4          I asked him what state he was in when he got his

5  social security card and he said

6

7

8

9  So then I invited him outside to continue speaking to him.

10         Q    At any time during this period of time, did you

11  call for a back-up?

12         A    I did before I walked inside the building.  The

13  information that I had first had, was it was just this one

14  person.  When the clerk met me outside the back before we

15  even walked inside the building, she said that he had two

16  friends with him and he was getting kind of antsy.  So

17  before even going to the back of the building I asked for at

18  least one more car.

19         Q    And that would be -- who arrived, Buckley?

20         A    Buckley got there first, but when we're asking for

21  them we don't know who they're sending.

22         Q    At what point did Buckley arrive?  Was that when

23  you were still inside, still talking to him?

24         A    No.  We hadn't been outside for very long and

25  Buckley showed up.  We were outside.



1     Q    And you asked him -- there came a time when you

2  asked the defendant to step outside?

3     A    Yes.

4     Q    All right.  And then while you were standing

5  talking to him outside, Buckley came?

6     A    Yes.

7     Q    Did any other deputy come when you were outside?

8     A    Yes.  Skipper showed up also.

9     Q    Pardon?

10    A    Deputy Skipper.

11    Q    Did Ferguson show up?

12    A    From what I've read, he did.  But I was focused on

13  what I was doing and I don't recall him at the office.  I

14  know he was there at the very end, but I don't recall seeing

15  him at the office at all.

16    Q    Did there come a time when the defendant left the

17  scene?

18    A    Yes.

19    Q    What happened?

20    A    He ran away from us, northbound, through the

21  parking lot.

22    Q    And what did you do then?

23    A    We chased after him screaming and hollering at him

24  to stop.

25    Q    All right.  You and --

1    A    Buckley.

2    Q    Buckley.  And where did you chase him?  Where did

3  he go?

4    A    Northbound across a small bridge between the

5  driver's license office and the building directly north of

6  it, which is Florida Metropolitan University.  As he was

7  running across the bridge, a large, white Cadillac was

8  southbound through the parking lot.  The Cadillac turned

9  into a deli as he turned to the right.  For a second I

10 thought the car was going to hit him, but the car stopped

11 and didn't.  He then cut through traffic and ran northeast

12 through that parking lot and towards a bank building and

13 then further past that the Blockbuster.  And then he crossed

14 over to Enterprise.

15   Q    Okay.  Did he run on the north side of the bank

16 building?

17   A    No.  He didn't pass across the front of the

18 building.  He was running -- he was kind of zig-zagging

19 through the parked cars in front of the deli in the general

20 direction of the bank building.  The next building to the

21 east was the bank.  He was running more northeast.

22   Q    Did he -- so he never went beyond the bank

23 building?

24   A    *No.*

25   Q    And he was heading in the direction of Blockbusters

1    but he never made it that far?

2         A    Yes.

3         Q    All right.  There came a time, presumably, when he

4    stopped proceeding northeast and he went northerly, or

5    did --

6         A    No.  He was pretty northeast.  It was pretty much

7    northeast.

8         Q    There came a time when he left the parking lot?

9         A    Yes.

10        Q    During this chase through the parking lot, what, if

11   anything, are you saying?

12        A    Screaming at him, stop, police, you're under

13   arrest, stop, come back.  We were trying to talk on the

14   radio.  Buckley and I were talking on the radio transmitting

15   at the same time.

16        Q    All right.  At the point of transmitting on the

17   radio -- what was the point of transmitting on the radio?

18        A    To get more help, to tell our dispatch what was

19   going on, direction of travel, description of the suspect.

20        Q    All right.  There came a time when the suspect left

21   the parking lot area and proceeded out onto Enterprise Road?

22        A    Yes.

23        Q    What happened then?

24        A    He was in that northeast direction, he went across

25   Enterprise and right to the first driveway entrance or exit

1    to the plaza on the north side of Enterprise. The first

2    driveway west of McMullen Booth Road. And a small white car

3    was at a stop sign waiting to come onto Enterprise.

4        Q    And what did he do then?

5        A    He ran to the driver's side of the car, opened the

6    door and began pulling on the neck of the driver in an

7    attempt, I believed, to pull the driver out of the car and

8    take the car.

9        Q    Now, is the car still in the driveway at this point

10   or is it out on Enterprise Road?

11       A    No. There's a stop sign when you're facing south

12   in the parking lot. You can go left or right onto

13   Enterprise. He was stopped at that stop sign.

14       Q    And what happened when the defendant started to put

15   his hands or arms inside the car?

16       A    We're still screaming. By then I had reached the

17   center turn lane of Enterprise, maybe 75 feet away from

18   where he was. I unholstered my weapon, came up on target.

19       Q    And then what happened?

20       A    I remember seeing that the driver of the car was

21   very old and he had his shoulder belt on. And the suspect

22   wasn't having any luck in pulling him out of the car and I

23   didn't have a shot at the suspect.

24       Q    How come?

25       A    Well, because the backstop was wide open parking

---

1    lot for one. Another, I would have been shooting across the

2    car and the driver of car was in between myself and the

3    suspect.

4        Q    Okay. At this point, the car is still in the

5    driveway?

6        A    Yes.

7        Q    Coming out onto Enterprise Road. And you are --

8    the car is to the northeast of you?

9        A    Yes.

10       Q    So you're on the --

11       A    More east than north. I had -- I'm running out of

12    gas. I'm done running and I'm more or less walking into the

13    middle of the road while he's getting into the car. So he's

14    not more north of me, he's more east of me. And I stopped

15    in the middle of the road. It is northeast but he's more

16    east.

17       Q    So had you shot at that point, you had the car and

18    driver between --

19       A    The driver was between me and the suspect. And

20    beyond the car was a wide open parking lot, plus McMullen

21    Booth Road further beyond.

22       Q    Where was Buckley at this point?

23       A    I don't know. When we were running through the

24    parked cars, he was behind me. And then as we -- as the

25    suspect got through the parked cars and went across

1    Enterprise, I was more of a direct, kind of following the

2    line he was on.  And Buckley was -- had swung around

3    somewhere to my right.  I really don't recall seeing

4    Buckley.

5        Q    When you were running after him, you were

6    encumbered by various items.  You have the equipment on,

7    radio and all the other stuff that you have on your belt?

8        A    Yes.

9        Q    Do you ever weigh it?

10       A    It's upwards of 20 pounds, I believe.

11       Q    Okay.  When we last left off, you felt that you

12   could not shoot because the car was in the way.  What

13   happened then?

14       A    This all happened in a very short amount of time.

15   The driver stepped on the gas hard enough to spin the tires

16   and the car came out southbound and then turned to the right

17   towards me in the inside westbound lane of Enterprise.

18   Enterprise is two east and two west there, with the center

19   turn lane.

20       Q    And what happened then?

21       A    As the car came out, I was -- I'm still tracking

22   him with my weapon at eye level and I brought my elbows in

23   toward me, what we refer to as a low ready gun position.

24   I'm still two hands on my weapon, roughly my hands around my

25   waist belt buckle.  The vehicle is coming towards me, the

1    driver's door is open, hanging open.  The suspect at that

2    point had put the driver in a choke hold, elbow to neck, and

3    was hanging from the car from the neck of the driver.

4         Q    Was the suspect -- did the suspect have the door

5    between him and the driver or was the door open?

6         A    No.  The door was open and swinging.

7         Q    The door was open swinging and he was -- so there

8    wasn't the door between him and the driver?  He was right

9    next to the driver?

10        A    No.  Well, the door was open.  He -- the door

11   couldn't have been between him and the driver because his

12   arms would have been cut off.  He opened the door and the

13   door stayed open.  He -- the door was open, he opened the

14   door.  He reached in and was trying all this, got the head

15   lock and then the driver hit the gas and started dragging

16   him down the road towards me.

17        Q    Then what did you do?  I last left that your hands

18   had been moved to the --

19        A    He's coming at me and as the vehicle came past me,

20   I kind of pivoted just -- I don't remember moving my feet.

21   I think I just turned my hips and kept my weapon where it

22   was and fired three rounds as it went past me, as the car

23   went past me.  The speed that the car was moving had the

24   momentum -- had forced his body, the suspect's body and

25   torso back towards the left rear quarter panel of the car.

1    He was, in fact, then sillhouetted against the back of the

2    car.  So then at that point I felt more confident in a shot

3    with a more definite background.  And I actually could have

4    touched him as he went by.  The door -- I still don't know

5    how the door didn't hit me.  The door was open as the car

6    went past me.

7         Q    What happened then?

8         A    He stayed attached to the driver's neck and the car

9    continued westbound.  I reholstered my weapon and started

10   running again and screaming again.  Just -- the car stayed

11   in the inside lane but drifted a little towards the gutter.

12   And there was a large box truck turning into the next

13   driveway entrance on the north side.  But wasn't quite

14   making -- hadn't completed his turn.  The end of the truck

15   was sticking out in the westbound curb lane of Enterprise.

16   Just before hitting the truck, the car stopped sharply, like

17   the driver had hit the brakes suddenly.  The suspect got his

18   feet underneath him and turned loose of the driver's neck

19   and ran around the door and into the box truck.

20        Q    Where was Buckley at this time; do you know?

21        A    He was behind me.

22        Q    Presumably, you were following the car down the

23   road?

24        A    I was, yes.

25        Q    Okay.  What happened then?

1    A   Right as soon as he got his feet underneath him and

2    I guess the driver realized that he wasn't being hung on any

3    more, he stepped on the gas and the little white car jumped

4    forward and hit the back of the box truck.  And I was kind

5    of thinking, well, now what?

6    I kept running straight down the center lane, the

7    center turn lane.  As I'm getting around the truck, more of

8    what's happening is opening up to me.  I come around the

9    back of the truck and the suspect had gone to the blue

10    station wagon and basically done the same thing.

11    He opened the door to the car and he was trying to

12    pull this driver out by his neck, trying to get hands on

13    him.  This driver had his shoulder belt on too, but he had a

14    real hard grip on the wheel.

15    Q   What happened then?

16    A   The station wagon is real close to Enterprise Road

17    and I'm really running out of energy now.  Got to the front

18    of the station wagon and turned and was walking almost

19    straight onto the left front of the station wagon.  As he is

20    still at the door and trying to get the driver out, I'm

21    still screaming at him.  At this point I'm almost begging

22    him, get away, on the ground, stop what you're doing and so

23    forth.

24    I can see the old man and his wife, they both had

25    their shoulder belts on and the grip that the driver of the

1   station wagon has on the vehicle.  I'm looking behind, at a

2   large S.U.V., and there's a younger woman, younger than the

3   other two drivers, younger woman with brown, short hair is

4   siting behind the station wagon, kind of looking down on the

5   scene.

6          And by then I was -- had my weapon in just one

7   hand.  And as tired as I was -- and I walked up and he let

8   loose of the driver of the station wagon and looked at me

9   and made a move to go back to the S.U.V.  And I raised my

10  weapon and fired one time and he fell.

11      Q    What kind of move did he make that you interpreted

12  to be going toward the S.U.V.?

13      A    Quick and straight back.

14      Q    And due north, heading due north?

15      A    Yes.  Not backing up.  He wasn't backing up.  It

16  was quick and it was a movement as if he's turning to get on

17  back.

18      Q    After he was shot, what happened?

19      A    He -- the momentum of his motion back toward the

20  S.U.V. took him just a little bit towards the left rear,

21  just off the left rear of the station wagon, and he went

22  down on his face.  That -- he didn't stay down.  He wasn't

23  like push ups, his -- he was bent at the elbows and his

24  hands were more or less like this.  His left hand more

25  closer to his face and he was kind of -- I don't know if

1    crab walk is the right thing, but he was still -- he wasn't

2    still. He still wasn't doing what we were screaming at him

3    to do.

4        Q    Which was?

5        A    Stay down, stop moving.

6        Q    All right. And then what happened?

7        A    Buckley gave him a burst of O.C. and then I think

8    he was -- I remember seeing Ferguson come up on my right

9    shortly after he fell. And then Buckley walked past where I

10   was and then gave him the O.C. and Buckley told me to

11   holster my weapon and move back. And Ferguson and Buckley

12   and Lieutenant Brady, I think, was there during the

13   handcuffing too. If not, he was there right afterwards.

14       Q    I'm sorry. You said Brady?

15       A    Lieutenant Brady.

16       Q    So by the time the handcuffs are going on,

17   Lieutenant Brady is there?

18       A    He drove his vehicle right up to just almost where

19   I ended up standing at the very end of it. I don't recall

20   seeing him put handcuffs on him. But right after -- not

21   long, right after that, Lieutenant Brady was there.

22       Q    Did the defendant make any statements?

23       A    After I shot him?

24       Q    Yes.

25       A    I was done with it by then. They just put me in

1    Lieutenant Brady's car and I didn't talk to him at all.

2        Q    There came a time when you were asked to give a

3    tape recorded statement and you did so?

4        A    Yes.

5        Q    You didn't author any written reports?

6        A    No.

7        Q    How long have you been with the Pinellas County

8    Sheriff's Office?

9        A    Since October of '95.

10       Q    What did you do before that?

11       A    I was with the Dunedin Police since '92, from '92

12   to '95.

13       Q    What did you do before that?

14       A    I was in the marine corps for six years.

15       Q    What did you do in the marine corps?

16       A    I was in the first marine division band of Camp

17   Pendleton.

18       Q    What training did you have for police work?

19       A    Basic academy and ongoing in-service training

20   throughout when I was with Dunedin and then our training

21   with the sheriff's office.

22       Q    Was the academy training here in Florida?

23       A    Yes.

24       Q    Where is that done?

25       A    Allstate Center, down in St. Pete.

1        MR. ALLDREDGE:  Your witness.

2                    CROSS-EXAMINATION

3    BY MR. MIGLIORE:

4        Q    If you would, let me ask you to give me an

5    abreviated version of the sequence of events illustrated by

6    use of these two diagrams.

7        A    Okay.

8        Q    I mean, I've listened all the way through, read a

9    whole bunch, but I think it would be helpful, at least for

10   me.

11       A    I parked here.  This is the back of the building.

12   They let me in here, let me in here.  The front door is

13   right here.  We're standing, talking, he's leaning up

14   against the building.  I'm here, Buckley is just south of

15   me.  He ran this way.  This is the small bridge here.  Right

16   about when he's here, car comes down, makes the turn.

17       Q    That's the Cadillac?

18       A    And they're coming at each other and the car turned

19   and he turned at the same time.  The car stopped here,

20   roughly, and then there is parked cars in through here.

21   We're running through parked cars here.

22       Q    That's the zig-zag part?

23       A    Yes.  This is the bank and then Blockbuster further

24   up here.  I think on the tape, we're screaming Blockbuster

25   just as a point of reference.  When he got about here is

1    when he went northeast.  Here -- the white car was sitting

2    here, stop sign is roughly here, and the white car is facing

3    southbound.

4         Q    That's the car occupied by the people we now know

5    as the Pendletons?

6         A    No.  That's Mr. Elwell.  This is the little white

7    Mercury.

8         Q    Okay.

9         A    This is where I kind of just stopped right in the

10   middle of the road here.  And there is a little -- not quite

11   accurate in that there's no center turn lane.  The center

12   turn lane isn't shown.  I'm standing in the middle here.  He

13   comes this way, makes a right turn, starts heading west, and

14   as he goes past me, roughly here, I fired three times.

15        Q    So that if there were bullets gone throughw the

16   door, it would have been -- number one, the driver door is

17   swung open?

18        A    Right.

19        Q    And he's hanging on?

20        A    Right.

21        Q    Are you then shooting after the vehicle's gone by?

22        A    No.  It kind of -- it's a timing thing.  I'm

23   getting him as he's coming past me -- as he's passing, me

24   not as he's gone past me.  And the first round did hit the

25   door by the driver's door handle.  Second got him and the

1   third got the left rear of the car.

2       Q       So you fired three shots at that time?

3       A       Yes.

4       Q       And the second one hit him to your knowledge now?

5       A       Yes. That's what I'm told, yes. Car continued

6   westbound, I'm running westbound and I'm somewhere in here

7   in this area and the car just stops short. And again, this

8   is a little misleading in that this truck had a real big box

9   to it and I recall it being more out in here.

10          The little white Topaz had drifted over and almost

11  splitting the lanes. And he stopped real sharp, like hit

12  the brakes, and then the suspect got his feet under him and

13  ran. And as soon as he stood up, he got on the gas again,

14  the little white car, and he hit the back of the box truck.

15  He endued up down here. He drove himself down here. That's

16  how the car ended up down here.

17          Suspect ran around the door, the open door of the

18  white car right to here and he's getting to here as I'm

19  getting around here. So the scene is opening up to me as

20  I'm coming around the end of the box truck. So he gets here

21  as I'm getting here and he opens the door and starts doing

22  what he's doing here and I kind of just went straight this

23  way. I'm walking straight north towards him.

24      Q       And he's on the other side of the door at that

25  point?

1    A    Yes. At that point the door is open and he's

2    reaching in with this driver and I'm coming straight up here

3    like this not in front of the car, but a little off of it

4    here. And about probably where the left front tire is is

5    when -- that's when he made his move back to here, to this

6    car. And I fired and he fell right around in here just off

7    the left rear.

8    Q    And the second time you strike him, you strike him

9    where?

10    A    In the stomach.

11    Q    So he's still facing you at this point?

12    A    Yes.

13    Q    Even though he's going towards this sport utility

14    vehicle?

15    A    Yes. From what I've read in the reports, the

16    entrance wound is off the belly button. From what I recall

17    in my memory, I recall hitting him in the back. But he did

18    look at me. And again, I made the determination that he was

19    going from here to here to here. Didn't get this car,

20    didn't get this car, was going for number three.

21    Q    And at that point, the other two deputies are

22    where, to the best of your recollection?

23    A    Again, when we're here, Buckley is south of me the

24    whole time. And then when we get to here, I remember

25    hearing Buckley more out of my right ear. So I know he's

1    kind of looping around.  I'm here, he's more looping around

2    this way.  So he ended up -- there's some distance between

3    the two of us.  I don't know how far behind me he was.  When

4    I was here and shot him, I don't know where Buckley was.

5    But I remember as soon as he fell, I remember seeing

6    Ferguson right away and this is Ferguson's cruiser number

7    right here.

8             MR. ALLDREDGE:  1571 is Fergusons?

9             THE DEPONENT:  If he's still driving the same car.

10   I believe there is corporal Zsido's car here.  But he fell

11   and I remember seeing Ferguson out of corner of my eye walk

12   up along side the truck here.  And I don't know if he came

13   up on my right or left side, but I didn't move after that.

14   I pretty much stayed there and Buckley came past me and told

15   me to holster.

16            And then at some point, I think probably when we

17   were in here, Mr. Elwell drove here.  I do remember telling

18   Mr. Pendleton he couldn't leave because he was going to

19   drive away.  We told him he couldn't leave.  He was in the

20   middle of a fairly important crime scene.  And Lieutenant

21   Brady came up and parked right about here.

22   BY MR. MIGLIORE:

23

24            Q    Brady got there after the defendant is on the

25   ground?

```
1      A    Yes.

2      Q    And cuffed, close to it?

3      A    Somewhere in there.  Somewhere.  I couldn't say.

4      Q    That's all I've got.  Thank you.

5                    REDIRECT EXAMINATION

6  BY MR. ALLDREDGE:

7      Q    Pendleton was going to drive away?

8      A    He wanted to drive away.  I just told him, you

9  can't leave.

10     Q    I don't have any further questions.

11          MR. MIGLIORE:  Mark it read.

12          (DEPOSITION CONCLUDED AT 3:20 P.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              CERTIFICATE OF OATH

2

3    STATE OF FLORIDA     )

4    COUNTY OF PINELLAS )

5         I, the undersigned authority, certify that CHARLES

6    STREET appeared before me and was duly sworn.

7         WITNESS my hand and official seal this 9th day of

8    January, 2001.

9

10

11                          Shana M. Allen
                            ─────────────────────
12                          SHANA M. ALLEN
                            Notary Public - State of Florida
                            My Commission No. CC809260
13                          Expires:  2/15/2003

14

15

16

17

18

19

20

21

22

23

24

25
```

CERTIFICATE OF REPORTER

STATE OF FLORIDA )

COUNTY OF PINELLAS )

I, SHANA M. ALLEN, court reporter certify that I was authorized to and did stenographically report the deposition of CHARLES STREET; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney of counsel connected with the action, nor am I financially interested in the action.

Dated this 9th day of January, 2001.

SHANA M. ALLEN

SUNCOAST REPORTING SERVICES, INC. (727) 823-1876